UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

          Plaintiff,

Case No. 1:20-cr-53

Honorable Hala Y. Jarbou

v.

GREGORY ROGERS,

          Defendant.
_____/

## OPINION

The Government has charged Defendant Greg Rogers with the following offenses for an incident occurring on January 27, 2020: possession with intent to distribute marijuana (Count I); possession of a firearm in furtherance of drug trafficking (Count II); and being a felon in possession of a firearm (Count III). In addition, Defendant has been charged with the following offenses for an incident occurring on April 28, 2020: possession with intent to distribute marijuana (Count IV); possession of a firearm in furtherance of drug trafficking (Count V); and being a felon in possession of a firearm (Count VI). On both occasions, the police found him in a car, in possession of a gun and a substantial quantity of marijuana.

Before the court is Defendant's motion to suppress evidence discovered by the state police on two separate occasions: (1) when they arrested him on January 27, 2020, and searched the vehicle he was in at the time; and (2) when they executed a warrant to search his cell phone on October 9, 2019. The Court held a hearing on the motion on October 16, 2020, at which Officers Peter Thompson and Kenneth Nawrocki testified. The Court also reviewed video footage of Defendant's arrest and of the vehicle search on January 27, 2020. After considering the evidence

and the testimony at the hearing, and the parties' arguments and briefing, the Court will deny the motion.

## I. Search of Vehicle (January 27, 2020)

On January 27, 2020, Grand Rapids police officers responded to a report of domestic assault at 941 Sherman Street. The victim claimed that her brother, Maxamillion Long, had strangled her. There was an outstanding warrant for Long's arrest.

The police department dispatched Officer Thompson to the scene. When he pulled up to the address, he saw the victim standing in front of her house, which is on the north side of the street. He noticed that there was a blue Chevy Cruze parked on the south side of the street, opposite the house. According to his testimony and his police report, he observed exhaust emanating from the rear of the Chevy Cruze. He also saw that someone was inside the vehicle.

Thompson approached the victim to interview her about the assault. She told him that Long had fled, pointing to the south. She thought that he might still be in the area. Thompson asked her if she knew whose vehicle was parked across the street (i.e., the Chevy Cruze). She did not know.

Officer Kenneth Nawrocki was on patrol in the area, so he went to 941 Sherman to assist Officer Thompson. When Nawrocki pulled up, Thompson told him to investigate the Chevy Cruze. Thompson believed that Long might be hiding inside. According to Thompson, Nawrocki became the "contact" officer for the vehicle at that point, which meant that Nawrocki was responsible for investigating the vehicle and making further decisions about it.

Nawrocki pulled up behind the Chevy Cruze and then got out of his cruiser. He then walked over to the passenger side of the Chevy Cruze, shining a flashlight into the interior, through tinted windows. Defendant was inside the vehicle, sitting in the front passenger seat. Defendant rolled down the front passenger-side window a few inches. Nawrocki asked him if the car

2

belonged to him. Defendant said that it belonged to his girlfriend, Cyesha. He said that his girlfriend had come to see his "cousin," pointing to the south. Meanwhile, Thompson crossed the road and stood next to Nawrocki. Nawrocki asked Defendant his name. Defendant initially responded that his name was "Greedy," but then he stated that his name was Greg Rogers. He said that he knew the victim, who was still standing on her porch at the time. He said that she was his "cousin," though not his biological cousin. And he knew her brother, "Max." Defendant said he did not have any identification on him.

Nawrocki went back to his cruiser to look up Defendant's information in the LEIN system. Meanwhile, Defendant called out to the victim from the partially open car window, saying, "This is Greg!" She responded that she knew him. Thompson continued to question Defendant, asking him if he had seen anyone else around. Defendant claimed that he had just arrived and that he was waiting for his girlfriend.

Nawrocki discovered an outstanding arrest warrant for Defendant for "CCW" (carrying a concealed weapon). Nawrocki went back to the vehicle and relayed this information to Thompson. Nawrocki asked Defendant if the officers could "check" him. Defendant agreed and asked to get out of the car. After Defendant stepped out, Nawrocki searched Defendant's pockets and put Defendant in handcuffs. The officers discovered car keys and over $700 in cash on Defendant. Then Nawrocki escorted Defendant to a police vehicle with the help of another officer. Nawrocki told Defendant that the "gig" was that Defendant had a "prior case" that they needed to "take care of." Defendant became distraught and complained that he had not been driving the vehicle. He asked to have his mother come get his "stuff."

After officers secured Defendant inside a police cruiser, Nawrocki went back to his own cruiser to run the plate on the vehicle. He discovered that it belonged to Defendant's girlfriend, Cyesha Cross. Then he walked over to the car and began searching the inside of it.

After searching the passenger side, Nawrocki went over to the driver side. There, he discovered a bag of marijuana and then asked for "IBO"[1] to come to the scene. He also found a gun tucked under the driver's seat and digital scales in the door pocket.

Nawrocki crossed the street and spoke to the victim and her mother, who repeatedly questioned why Defendant was being arrested and his car searched. After some back and forth, Nawrocki claimed that the police could search the car as part of a "cursory wingspan search." The victim asked for Defendant's belongings and for the keys to the car, but Nawrocki refused, telling her that the car had a "loaded gun" inside. Later, Nawrocki used the keys to lock the car. Eventually, a tow truck arrived and took the vehicle away. The owner of the vehicle never showed up during the hour or so that Thompson and Nawrocki were present on the scene.

The Fourth Amendment generally requires warrants supported by probable cause in order to conduct a valid search. There is no dispute that the officers did not have a warrant to search the vehicle. Defendant claims that the search was invalid and was not justified by any exceptions to the warrant requirement.[2]

**A. "Standing"**

The Government contends that Defendant does not have "standing" to object to the search because he was not the owner of the vehicle. "[T]he Supreme Court rejected the concept of 'standing' in *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978)." *United States v. Smith*, 263 F.3d

---

[1] IBO refers to the forensics unit at the police department.

[2] Defendant does not challenge the officers' decision to question him.

571, 581 (6th Cir. 2001).  Standing is now recognized as "the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  *Rakas*, 439 U.S. at 133.  In other words, the Government contends that Defendant cannot rely on the Fourth Amendment to challenge the search because he did not have a legitimate expectation of privacy in the area searched.  "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a *third person's* premises or property has not had any of his Fourth Amendment rights infringed."  *Id.* (emphasis added).

To determine whether Defendant can challenge the search, the Court "must determine first, whether he had an actual, subjective expectation of privacy, and second, whether that expectation was a legitimate, objectively reasonable expectation."  *Smith*, 263 F.3d at 582.  "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *Rakas*, 439 U.S. at 143 n.12.

"Whether a legitimate expectation of privacy exists in a particular place or item is a determination to be made on a case-by-case basis."  *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).

> Aside from a defendant's "proprietary or possessory interest in the place to be searched or item to be seized," some factors that courts have considered when "identifying those expectations which qualify for Fourth Amendment protection" include "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; [and] whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion."

*United States v. Ocampo*, 402 F. App'x 90, 95-96 (6th Cir. 2010) (quoting *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000))  "A defendant has the 'burden of establishing his standing to

assert a Fourth Amendment violation.'" *United States v. Jenkins*, 743 F. App'x 636, 648 (6th Cir. 2018) (quoting *Smith*, 263 F.3d at 582).

*Rakas* is instructive for a vehicle search like the one at issue here. In that case, the defendants sought to suppress evidence recovered from the search of a vehicle in which they were merely passengers when the police stopped the vehicle. The Supreme Court held that they could not challenge the search because "[t]hey asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Rakas*, 439 U.S. at 148. In other words, "they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers." *Id.*

Like the defendants in *Rakas*, Defendant Rogers was neither the owner of the vehicle nor the driver. The car belonged to Defendant's girlfriend who, according to Defendant, drove the vehicle to that location and was visiting someone nearby. In addition, Defendant does not claim an interest in the property seized.

Defendant contends that this case is different from *Rakas* because he possessed the keys to the vehicle, which gave him a possessory interest in it. In *Rakas*, the Supreme Court distinguished the case of *Jones v. United States*, 362 U.S. 257 (1960), in which the friend of an apartment owner had permission to use the searched apartment, stored his possessions there, had keys to the apartment, and thus "had complete dominion and control over the apartment and could exclude others from it." *Jones*, 362 U.S. at 149. Consequently, that friend had a privacy interest on which to base a Fourth Amendment challenge to the apartment search, even though he was not the owner of the apartment.

*Jones* is distinguishable because there is no evidence that Defendant had permission from the owner to use the vehicle or be present inside it. "*Rakas* makes clear that '"wrongful" presence

6

at the scene of a search would not enable a defendant to object to the legality of the search.' . . . Likewise, 'a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile.'" *Byrd v. United States*, 138 S. Ct. 1518, 1529 (2018) (quoting *Rakas*, 439 U.S. at 141 n.9). Neither Defendant nor his girlfriend testified at the suppression hearing. Moreover, there is no evidence that Defendant's girlfriend was ever present with Defendant. No one saw the vehicle arrive, and the officers testified that Defendant's girlfriend never appeared on the scene while they were present. Defendant cannot demonstrate an expectation of privacy in the vehicle without first demonstrating that he had permission to use it. *See Jenkins*, 743 F. App'x at 648 (finding that the defendant failed to present evidence of an expectation of privacy in a searched vehicle where he did not testify at the hearing or present any record evidence of his permission to use it).

Defendant's presence in, and possession of the keys to, the vehicle does not establish that he had that permission. *See Jenkins*, 743 F. App'x at 648 (holding that possession of keys to a car rented to someone else does not establish permission to use it); *United States v. Sanchez*, 635 F. 3d 47, 64 (2d Cir. 1980) (same); *see also United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) ("The fact that defendants were observed using the car does not establish their right to use the car.").

Even if the Court were to infer from the circumstances that Defendant had permission to possess or occupy the vehicle, the evidence does not establish that he had the right to exercise significant control over it, let alone "complete dominion and control." He claimed at the time of his arrest that he did not drive the vehicle; his girlfriend did. He also claimed that his girlfriend was visiting someone nearby, and that he was waiting for her to return. Moreover, Defendant could not lawfully drive the vehicle because he could not produce any form of identification, such

7

as a driver's license, when asked by the police to do so. In other words, for all intents and purposes, his girlfriend was still in control of the vehicle. Unlike the defendant in *Jones*, who could enter and leave the apartment at will and store possessions there for safekeeping, Defendant here was, at best, a temporary occupant of someone else's vehicle, waiting for the owner to return. His privacy interests were much closer to those of the passengers in *Rakas* than the defendant in *Jones*.

*Jones* is also distinguishable because that case involved an apartment, not an automobile. An individual's expectation of privacy in an automobile is lower than his expectation of privacy in a residence. "Automobiles operate on public streets; they are serviced in public places; they stop frequently; they are usually parked in public places; their interiors are highly visible; and they are subject to extensive regulation and inspection." *Rakas*, 439 U.S. at 154 n.2 (Powell, J, concurring.). In short, as a passenger in a vehicle waiting for the return of its driver and owner, Defendant did not have a legitimate expectation of privacy in the interior of the vehicle. Accordingly, he cannot claim that his Fourth Amendment rights were violated by a search of that vehicle.

### B. Inventory Search Exception

Even assuming Defendant has standing, Defendant's challenge to the search fails under the inventory-search exception for impounded vehicles. Generally, the Government cannot automatically search a vehicle following the arrest of its occupant. A vehicle search is subject to "the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted). A routine inventory search in connection with impoundment of a vehicle is one of those exceptions. *See Colorado v. Bertine*, 479 U.S. 367, 374 (1987) ("[R]easonable police regulations relating to inventory procedures administered in good

faith satisfy the Fourth Amendment."). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996).

### 1. Validity of Impoundment

In order for an inventory search of a vehicle to be lawful, the decision to impound the vehicle must be lawful. *See United States v. Snoddy*, --- F.3d ---, 2020 WL 5701910, at *2 (6th Cir. Sept. 24, 2020) ("A vehicle is lawfully seized and, thus, subject to an inventory search if it is lawfully impounded."). The state cannot impound a car or conduct an inventory search simply because it suspects that there might be evidence of criminal activity inside the vehicle. *See Bertine*, 479 U.S. at 372 (an impoundment or inventory search would be invalid if the officers "acted in bad faith or for the sole purpose of investigation"). As the Sixth Circuit summarized in *Snoddy*:

> Officers exercising their discretion to impound a vehicle must do so "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." [*United States v. Jackson*, 682 F.3d 448, 454 (6th Cir. 2012)] (quoting *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001)). Similarly, "[i]n order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" *Smith*, 510 F.3d at 651 (quoting *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998)); see also *United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (stating that the inventory exception applies only when officers follow "'standardized criteria' or 'established routine' governing the scope of the inventory searches'" (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990))). The search is unconstitutional if "the evidence establishes that the 'police acted in bad faith or for the sole purpose of investigation' in conducting an inventory search." *Hockenberry*, 730 F.3d at 659 (quoting *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003)). In other words, officers cannot hide an investigative search under the pretext of an inventory search. *See id.*; *South Dakota v. Opperman*, 428 U.S. 364, 375-76 (1976). That said, "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." [*United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007)].

*Snoddy*, 2020 WL 5701910, at *2.

In other words, impoundment decisions and inventory searches will not pass muster under the Fourth Amendment if the evidence establishes that they were made in bad faith or for the sole purpose of conducting an investigation. *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013). At the same time, "[t]he Fourth Amendment permits impoundment decisions and inventory searches that are *objectively justifiable* . . . , regardless of an officer's subjective intent." *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (emphasis added).

In *Snoddy*, the Sixth Circuit upheld an impoundment and inventory search because there were objectively justifiable grounds for impounding the defendant's car. The applicable policy gave the officer discretion as to impoundment. Furthermore, the defendant was "the sole occupant of the car, and the car would have been left out on the side of the highway near an intersection in the middle of the night where it could be stolen, vandalized, or hit by another vehicle." *Snoddy*, 2020 WL 5701910, at *4. The impoundment and search were justified, even though the officer told dispatch that he was going to search the car, repeatedly asked the defendant for consent to search the car, and indicated his belief that he would find drugs in the car. *Id.* Also, the officer did not call a tow truck until after asking for consent to search the car. *Id.* Impounding the car (and then conducting an inventory search) in these circumstances was justifiable, according to the court, regardless of the officer's statements and beliefs.

Defendant argues that the inventory-search exception does not apply here because the officers did not follow their department's policy when deciding to impound Defendant's car. The Grand Rapids Police Department's written policy for impoundment states that police "shall" impound a car in the following circumstances:

a. It is evidence in a crime or needs to be held for investigative purposes.

b. It is parked illegally and could potentially present a traffic hazard.

  c. It is parked on private property and an emergency exists, i.e. blocking drive or loading dock with persons waiting to get in or out and the owner/lessee wishes the vehicle removed. . . .

  d. It has been marked abandoned and is parked or left standing in the same location in excess of 48 hours.

  e. The driver was arrested and is not the owner.

  f. It has been reported stolen and the owner cannot be notified or is unable to come to the scene and take possession of the recovered vehicle within a reasonable amount of time.

  g. The court has ordered a vehicle impounded due to overdue parking citations.

  h. The owner or driver has been involved in an accident or has been taken into custody and is not physically, mentally, or legally capable of driving the vehicle or giving consent to leave it.

(Impound Policy, ECF 22-2, PageID.82-83.)

  None of the above circumstances have a perfect fit to this case. Section (e) is the closest: "The driver was arrested and is not the owner." The problem is that, according to Defendant, he did not drive the vehicle. And the police did not actually see Defendant driving the vehicle; Defendant was sitting in the passenger seat when police arrived, and he claimed that he came with his girlfriend.

  On the other hand, Officer Nawrocki noted that the purpose of the policy is, among other things, to "[p]rotect the City of Grand Rapids and its employees from claims or disputes over lost, stolen, or damaged property." (Impound Policy, PageID.82.) Nawrocki had this purpose in mind when deciding to impound the vehicle.

  In particular, Nawrocki was concerned that Defendant might not have permission to use the vehicle. Defendant's name was not on the title and the owner was not present. Nawrocki was worried that, if they left Defendant in possession of the keys, Defendant could obtain possession of the vehicle without permission from the owner if he was released on bond. Nawrocki's training

11

and experience had taught him to be wary of claims from a driver whose name was not on the vehicle's registration that they had permission to use a vehicle.  He was aware of a situation in which another officer trusted a driver who claimed that he had permission to use a vehicle, but the owner later told the police that the driver's statement was not true.  Also, Nawrocki was worried that, by leaving the vehicle parked on a public street, the car could be damaged or looted and the owner would hold the City of Grand Rapids responsible.  That neighborhood was one of the "more violent" areas of the city, according to Nawrocki.  Also, it was winter, which meant that, in snowy conditions, plow trucks or other vehicles driving down the street could collide with the car.

In addition, Nawrocki noted that the policy provides that, "if none of the impoundment criteria are met," officers can "[l]eave the vehicle properly parked and secured at the scene, if . . . the owner requests it and will take full responsibility for it."  (Impound Policy, PageID.83.)  According to Nawrocki, this meant that they could leave the vehicle at the scene only with permission from the owner.  In other words, if the owner did not give them permission to do so, they could not leave the vehicle.  The Court finds that this is a reasonable interpretation of the policy.  At the very least, Nawrocki's decision to impound the car was a reasonable exercise of discretion considering the goals of the policy and a very similar circumstance in which officers are *required* to impound vehicles, i.e., when the driver is arrested and is not the owner.

Moreover, Nawrocki's impoundment decision was objectively justifiable.  Here, the police had removed the sole occupant of a vehicle parked on a public street.  This occupant possessed the keys to the vehicle, but the owner was not around.  The police were justified in taking custody of the vehicle in these circumstances.  The vehicle did not present a traffic hazard, like the one in *Snoddy*.  But nonetheless, there were appreciable risks to leaving the vehicle parked on the street, in the winter, in a neighborhood that the officer described as "more violent."  By taking possession

12

of the vehicle, the police protected the city from possible claims from the owner that the city was responsible for any loss or damage to the vehicle that could occur if Nawrocki left the keys in Defendant's possession or left the car at the location where the officers found it.[3]

In addition, there is no significant evidence of bad faith or pretext behind Nawrocki's decision. Defendant notes that Nawrocki did not discuss the decision with anyone before searching the vehicle; however, both Nawrocki and Thompson testified that Nawrocki was responsible for that decision. Also, Nawrocki impounded cars on a regular basis. Thus, there was no need for him to discuss the decision with Thompson beforehand.

Defendant points to the fact that Nawrocki told the victim's mother that he could search the car as part of a wingspan search (which the Government acknowledges would not justify searching the car). However, Nawrocki testified that this statement was a mistake, made in the heat of an argument. The Court finds his testimony to be credible. Indeed, in his police report, Nawrocki wrote that he searched the car because "the owner was no where around and the vehicle was left unlocked and running"; they could not lock the car and let Defendant have the key. (Nawrocki Report, PageID.73.) The statement in the police report is consistent with the justifications Nawrocki provided at the suppression hearing for impounding the car.[4]

Defendant also points to an apparent discrepancy between the fact that Nawrocki stated in his police report that he saw marijuana shake on the vehicle floorboards and smelled unburnt marijuana in the vehicle, ostensibly before searching it, yet neither Nawrocki nor Thompson ever

---

[3] Defendant contends that leaving him with the keys would have preserved the "status quo," but that argument assumes that Defendant had permission to use the vehicle in the first place, which he has not established. It also assumes that the owner was willing to leave the vehicle unoccupied, parked on the street, without access to the keys. Surely the owner did not foresee or expect that possibility.

[4] Defendant disputes Nawrocki's assertion that the car was "running," but that is what Thompson had told him before he arrived on the scene. And although there is no evidence of exhaust emanating from the car in the police videos, it was reasonable for Nawrocki to infer that Defendant had activated the car in some manner if Defendant was able to operate the automatic windows before speaking with Nawrocki. Thus, Nawrocki's prior statement in his police report does not undermine his testimony or his credibility.

mentioned the smell or presence of marijuana until after the search. However, Nawrocki explained in his testimony that the smell of marijuana was not a significant concern because it is not unusual for them to encounter marijuana in their work; it happens on a daily basis. Also, the possession of a small quantity of marijuana is legal in the State of Michigan, so Grand Rapids police officers generally do not rely on the smell of marijuana as probable cause to search a vehicle. This testimony is credible, and it supports the Government's assertion that Nawrocki impounded and then searched the vehicle as part of a routine inventory search, rather than for the purpose of conducting an investigation.

Defendant also claims that police should have considered a different alternative to impoundment. The impound policy provides the following:

> As an alternative to vehicle impoundment, officers may:
>
> a. With on-scene approval from the owner, allow a responsible person who possesses a valid operator's license to assume responsibility of the vehicle and its contents.
>
> b. Summon a person of the owner's choice to come to the scene, in a timely manner, to take custody of the vehicle.
>
> c. Leave the vehicle properly parked and secured at the scene, if none of the impoundment criteria are met and the owner requests it and will take full responsibility for it.

(Impound Policy, PageID.83.) None of these alternatives applied. As discussed above, the owner was not on scene and did not give approval for someone to take responsibility for the vehicle, or for officers to leave the vehicle at its location. And note further that these alternatives are *permitted* by the policy; they are not required.

Defendant also claims that the officers should have made some effort to contact the owner; however, an impoundment decision is not impermissible simply because other alternatives to

14

impoundment might exist. *See Kimes*, 246 F.3d at 805 (holding that officers were not required to "take[ ] it upon themselves to call [the defendant's] wife and ask her to get the vehicle").

Defendant also believes it is relevant that the officers did not call the tow truck before conducting the search; however, Nawrocki explained that it takes some time to process a vehicle,[5] and he did not want to waste the tow truck driver's time. In other words, the timing of the call for a tow truck does not suggest that impoundment was a pretext for an investigative search.

In summary, Nawrocki impounded the vehicle for legitimate reasons, consistent with the city's policy. He did not do so as a pretext for conducting an investigative search.

### 2. Validity of Search

Defendant argues that the search was not valid because the officers did not follow police policy for inventory searches. In his motion to suppress, Defendant asserted that the officers did not complete a full inventory of the contents of the vehicle, as required by policy, because he did not receive one from the Government. The policy requires the following:

> 1. All vehicles removed by the Grand Rapids Police Department for impound, evidence, or safekeeping shall be internally and externally inventoried. The vehicle inventory report form shall be accurately and thoroughly completed on all copies.
>
> 2. The reporting/arresting officer is responsible for completing the vehicle inventory. If another employee voluntarily or by assignment conducts the inventory, the responsibility shall be passed to that employee.
>
> 3. When it is not possible to conduct a full inventory without potentially destroying evidence, the reporting officer shall complete as much of the form as possible prior to the vehicle's removal. For example:
>
>> a. The type of removal
>>
>> b. The incident and requisition numbers associated with the inventory
>>
>> c. The location, time and date
>>
>> d. Vehicle and owner information

---

[5] Among other things, the police department must photograph the vehicle to make a record of its condition.

>    e. Exterior condition of the vehicle
>
>    f. Any other information available from a visual survey of the interior.
>
>    g. All valuables over $100 as well as any electronic devices shall be entered into PMU for safekeeping.
>
> 4. In those cases when the reporting officer cannot complete the inventory, the employee assigned to process the vehicle shall complete a "followup" inventory report form and identify it as such in the "note" section.
>
> This inventory should be complete in and of itself, i.e. type of removal, the numbers associated with the inventory, the vehicle information, exterior condition and interior inventory.
> ...
>
> 6. Discovery of contraband during a vehicle inventory that may result in the filing of additional charges should be documented under a separate incident number.
>
> 7. The reporting officer shall document the removal of any property from the vehicle in accordance with Departmental procedures in the related incident report.
>
> 8. The wrecker driver shall signify receipt of the vehicle in its stated condition by signing the inventory form. The reporting officer shall retain the Police Department copy and give the wrecker driver the remaining two copies.

(Impound Policy, PageID.84-85.)

At the hearing, however, the Government provided a copy of the inventory report completed by Nawrocki. Also, Nawrocki explained the contents of the report at the hearing. This report appears to comply with the policy. Thus, Defendant's argument is unsupported.

In short, the decision to impound the vehicle and to conduct the inventory search were reasonable, justified, and consistent with the parameters of the city's policy. Also, these decisions were made in good faith; the evidence does not suggest that they were a pretext for an investigative search. Accordingly, the vehicle search is valid under the Fourth Amendment.

### C. Probable Cause

The Government also argues that the vehicle search is justified based on probable cause and the automobile exception to the warrant requirement. The Court need not examine that issue, however, because the search is justified based on the inventory-search exception.

## II. Search of Cell Phone (October, 2019)

In his motion, Defendant also objected to the execution of a warrant to search his cell phone. At the suppression hearing, however, Defendant agreed that this issue is moot because the Government does not intend to use evidence recovered from the cell phone in support of its case in chief.

## III.  Conclusion

For the foregoing reasons, the motion to suppress will be denied. An order will enter consistent with this Opinion.

Dated:   October 30, 2020              /s/ Hala Y. Jarbou
                                       HALA Y. JARBOU
                                       UNITED STATES DISTRICT JUDGE